1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    TROY SMITH,                                Case No.  11-cv-01791-SI

                    Petitioner,
8
                                                **ORDER DENYING PETITION FOR**
9         v.                                    **WRIT OF HABEAS CORPUS**

10   KEVIN CHAPPELL, Warden,

                    Respondent.
11

12

13        Troy Smith, a prisoner at San Quentin State Prison, filed this petition for writ of habeas

14   corpus pursuant to 28 U.S.C. § 2254, challenging his 2006 conviction in San Francisco Superior

15   Court.  This matter is now before the Court for consideration of the merits of the petition.  For the

16   reasons discussed below, the petition is DENIED.

17

18                                        **BACKGROUND**

19        On October 20, 2006, petitioner was convicted of four counts of robbery in the second

20   degree in violation of California Penal Code § 212.5(c), each with an excessive taking of funds

21   allegation pursuant to Penal Code § 12022.6(a)(4); four counts of false imprisonment in violation

22   of Penal Code § 236; two counts of burglary in the second degree in violation of Penal Code

23   § 459; and one count of conspiracy in violation of section § 182(a)(1).  Second Amended Petition

24   at 3.  All counts included an enhancement under Penal Code § 12022(a)(1) for possession of a

25   firearm during the offenses.  *Id*.  Petitioner is currently serving a sentence of twenty-six years in

26   the San Quentin State Prison; the warden of San Quentin State Prison is respondent Kevin

27   Chappell.  On April 12, 2011, petitioner filed this petition for writ of habeas corpus.  Petitioner

28   contends that he is entitled to the writ for two reasons: (1) violation of his Fifth and Fourteenth

United States District Court
Northern District of California

Amendment rights to due process under *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) violation of his Fourteenth Amendment right to due process under *Jackson v. Virginia*, 443 U.S. 307 (1979).

## STATEMENT OF FACTS

The following factual background is taken from the order of the California Court of Appeal:

Lang Antiques, which we will refer to as the jewelry store or the store, occupies a portion of the ground floor of a building in the Union Square area of downtown San Francisco. As of April 2003, the remaining portion of the building's ground floor (the restaurant space) was vacant. It had formerly housed a restaurant named Rumpus, which had gone out of business. The main entrance to the restaurant space was on Tillman Alley, with another entrance on Campton Place.

The jewelry store had a showroom in the front; a back room (the safe room) separated from the showroom by a curtain; a bathroom adjoining the safe room; and offices upstairs. The safe room held three safes in which the store's inventory of jewelry was secured when the store was closed. The back wall of the safe room, against which the safes normally stood, was an interior wall of the overall building, and separated the safe room from a room in the vacant restaurant premises.

The jewelry store's security system included door alarms, panic buttons, and a motion detector in the safe room, all monitored by a private alarm company, plus a video surveillance camera in the safe room. In addition, the front entrance was protected by roll-down metal grating.

The jewelry store was open Monday through Saturday. On Saturday, April 5, 2003, at 5:30 p.m., salesperson Richard Frey closed the jewelry store and turned on the alarm system. Before leaving, he put a new tape into the video surveillance system. The tapes could only record for 24 hours, however, so even with a new tape inserted at closing time on Saturday, the surveillance system would stop recording at about 5:30 p.m. on Sunday.

At the time Frey closed the store on April 5, 2003, the safe room was in the process of being remodeled under the supervision of the store's owner, Mark Zimmelman, and its manager, Suzanne Martinez. Because of the remodeling, the room was in some disarray; two of the safes had been moved from the back wall of the safe room to a side wall, and a third safe had been replaced with a different, larger safe from another location. In addition, a ladder had been left there.

At 11:16 p.m. on Sunday, April 6—after the video surveillance camera had stopped recording—a motion detector at the jewelry store, probably the one in the safe room, triggered an alarm. The alarm company alerted the police and then called Zimmelman. Zimmelman asked to be notified if the police found a problem, but did not take any further action. A police officer checked the exterior of the store and saw no problem; the exterior grate was down, no windows were broken, no alarm bells were ringing, and he did not observe anything amiss in the

showroom when he looked through the windows with his flashlight. After about five minutes passed and no additional movement was detected, the alarm ceased. The police officer reported the premises secure, and no further action was taken.

The following morning, Monday, April 7, 2003, Frey returned to the jewelry store at about 9:15 or 9:30 a.m. to open up. Standard security procedures required that there be two people present to open the store, so Frey met another store employee there, Erin Beeghly, a student who worked part-time as a gemologist and sales assistant. Frey opened the store, went into the safe room to disable the alarm system, and then went upstairs to the office. Beeghly headed through the safe room and into the bathroom, intending to change her clothes.

When Beeghly opened the bathroom door, two tall African–American men with guns jumped out. They ordered her to the floor, and told her not to look at them. Frey heard Beeghly scream, and started down the stairs, only to encounter a man waiting at the bottom of the stairs with a gun pointed at him. The man was not wearing a mask, so Frey got a good look at his face. Frey described the man as African–American, about six feet tall, with a medium or light complexion, and a nose resembling that of football player Jerry Rice. Later, Frey was able to identify the man as Dino Smith, appellant's brother. When shown a photographic lineup, Frey picked appellant's photograph, as well as Dino Smith's, as depicting possible suspects.

The man put the gun to Frey's back and directed him to enter the safe room, where Frey saw another man holding a gun pointed at Beeghly. The robbers told Frey not to look at them, and one of them directed him to open the safes. Frey had difficulty doing so, because he was very nervous. After Frey managed to get one of the safes open, the doorbell rang. Frey told the robbers that it could be Miranda Gonsalves, the bookkeeper, and the robbers directed him to go and let her in, and bring her to the safe room. Beeghly was kept in the safe room with the robbers as a hostage.

When Frey opened the door for Gonsalves, he told her quietly that they were being robbed, but she did not really grasp what he was saying, and started to head upstairs to work on the accounts. As Gonsalves neared the top of the stairs, Frey called to her, and a light-skinned African–American man emerged from the safe room, ran upstairs after her, pointed a gun at her, and ordered her into the safe room. There, a second man, who was darker skinned and seemed older, then directed her to face the back wall. The first man seemed to be wearing a mask, but he pushed it up onto his forehead, so Gonsalves could see his face. Two years later, after seeing a news story about the robbery, Gonsalves identified the first man as George Turner. Shortly after the robbery, Gonsalves also picked appellant's photograph, as well as Dino Smith's, as depicting possible suspects from a photographic lineup, but she was not sure of these identifications.

Frey then resumed trying to open the safes. He was able to open the second one, but not the third, which was the one that had recently been moved into the jewelry store from a different location. As Frey was working on getting the third safe open, the doorbell rang again. It was Martinez, the store manager. Martinez had a key, but because she could not see any other store employees in the front room, she complied with the store's standard security procedures by ringing the doorbell rather than unlocking the front door herself.

Frey let Martinez in, quietly told her that a robbery was in progress and that Beeghly was being held hostage, and went back into the safe room with her. Frey tried again to open the third safe, but failed, so he asked Martinez to try, and she

3

succeeded.

The intruders emptied the contents of the safes into large plastic bags. At the request of Frey and Martinez, they left behind some of the items in the safes that were not part of the store's inventory, but had been left by customers for repair or on consignment. Because the store kept very complete inventory records, it was possible to determine precisely what had been taken. The final tally was 1,297 pieces of jewelry, with a value of almost $4.5 million.

Before leaving, the intruders bound the employees with plastic handcuffs and duct tape, and left them lying or sitting on the floor. While this was happening, Frey noticed for the first time that there was a large hole in the wall of the safe room, which had not been there when he left the store on Saturday. Gonsalves also noticed the hole at some point during the crime, though she could not recall exactly when. Frey and Gonsalves both looked through the hole and could see a figure moving around in the room on the other side of the wall. They could not see the person's face or even determine gender, however, because of their angle of view. Around this time, Gonsalves, Martinez, and Beeghly all heard a female voice that seemed to be coming from a walkie-talkie in the room on the other side of the hole. The voice sounded very professional, like a dispatcher, and seemed to be counting down time.

Finally, one of the intruders said, "Time's up, let's go," and they left through the hole in the wall. Martinez, who was the only one of the store employees who had been bound only with duct tape and not with handcuffs, was able to free her hands shortly thereafter, and then got scissors and freed the others. None of the employees were physically harmed, but all of them had been frightened while the crime was occurring. After freeing her coworkers, Martinez called another employee who was at the store's central office location and told that employee to call the police.

When the police arrived and investigated, they found that, as already indicated, the hole in the safe room wall led into the vacant restaurant premises. They also discovered that the hole had been drilled at a spot that constituted the weakest place in the wall dividing the store from the restaurant, because that part of the wall had formerly been occupied by a door with a glass panel in it. Two people who had been in the restaurant space within a few days before the robbery—a prospective tenant and an electrician—confirmed that the hole had not been there when they last saw the wall.

The police investigation also revealed that the latch of the exterior door from Tillman Place into the restaurant space had been rigged with a wire so that it could be opened from the outside. The building owner had not seen this wire mechanism prior to the police investigation.

The police also learned that a cardboard box had been taped over the motion detector in the safe room, and the jewelry store's phones had been disconnected. The motion detector was mounted high up in the safe room, but the intruders had apparently been able to reach it using the ladder that had been left in the room due to the remodeling. The police found a piece of posterboard lying on the floor of the safe room that had a sticky spot on it; when the sticky spot was matched up with a rolled piece of duct tape that was stuck to the wall right above the hole, it appeared that the posterboard had been used to cover up the hole. Later, both appellant's fingerprints and Turner's were found on that piece of posterboard.

Appellant's fingerprint was also found on the sports section of a newspaper in the

kitchen area of the restaurant space. Turner's fingerprints were on the front page of the same newspaper. The evidence at trial showed that the particular newspaper edition in question was available only from news racks in San Francisco starting sometime after 2:47 a.m. on Monday morning.

Although the jewelry store's security camera had stopped recording by the time the intruders entered the store, the police were able to obtain a video surveillance tape from an exterior camera belonging to a nearby department store, which happened to cover the Campton Place door to the restaurant space. The tape showed three people entering that door at about 8:55 a.m. Monday morning, one of whom carried a newspaper, and four people leaving through the same door at 9:48 a.m. The tape was not clear enough to show the people's race or gender.

On April 25, 2003, about two weeks after the crime, two police officers went to appellant's apartment in Oakland with an arrest warrant. The building manager let the officers into the apartment, but it had been cleaned out and vacated. The only things left in the apartment were some cleaning supplies, a bag of puppy food, and a bathtub full of water that was still warm. As the officers were leaving, a security guard told them that someone was in the building's parking garage packing up some things. The officers went to the garage, where they found a man named Je Kim standing next to a car that had clothes packed into the trunk, and bags of personal belongings and cleaning supplies, as well as a small puppy, in the passenger compartment. Kim said the puppy was his. The items in the trunk of the car included a box of papers containing mail addressed to appellant.

When asked for his identification, Kim told the officers to look for it in the car's glove compartment. In the glove compartment, the officers found a pair of diamond earrings on a display stand, with a price tag attached. Kim told the officers that he had obtained the earrings in the apartment of Debbie Warner, who was the girlfriend of appellant's brother, Dino Smith. Martinez, the jewelry store manager, later identified the earrings as part of the merchandise stolen during the crime.

Five days later, police searched Warner's apartment. In it they found the box of papers, including appellant's mail, that had been in the trunk of Kim's car. They also found appellant's wallet and driver's license. They did not, however, find any of the stolen jewelry.

The police arrested George Turner in June 2003, and later traced Dino Smith to New York, where he was arrested about a year after the crime. Appellant remained at large until March 2006, when he surrendered to the police in the company of his attorney.

On May 22, 2006, appellant was charged by information with four counts of second degree robbery (Pen.Code, § 212.5, subd. (c)4), each with an excessive taking allegation (§ 12022.6, subd. (a)(4)). Appellant was also charged with four counts of false imprisonment (§ 236), with an enhancement under section 12022.1, subdivision (a)(1); two counts of second degree burglary (§ 459); and one count of conspiracy to commit robbery (§ 182, subd. (a)(1)). All of the charges except the conspiracy count included an allegation that a principal in the crime was armed with a firearm. (§ 12022.1, subd. (a)(1).) The information alleged that appellant had prior serious felony convictions, including three "strikes" (§ 667, subds. (a), (d), (e); § 1170.12, subds. (b), (c)), and that he had served a prior prison term (§ 667.5, subd. (b)).

The jury at appellant's trial found him guilty on all counts, and found the gun use

5

and excessive taking enhancement allegations true. Appellant waived jury trial as to the prior conviction allegations, and the court found them true.

On May 8, 2007, the trial court struck two of appellant's three "strike" priors, and sentenced appellant to 26 years in prison, which included upper term sentences on some of the counts.

### PROCEDURAL HISTORY

Petitioner appealed his conviction to the First Appellate District Court of Appeal and on September 29, 2009, the Court of Appeal affirmed the convictions and sentence.   On January 13, 2010, the California Supreme Court denied petitioner's petition for review.   The appeal and petition for review only addressed petitioner's claim that his Fifth and Fourteenth Amendment rights were denied because one of the elements of robbery was not met under the prosecution's theory (plaintiff's claim was raised pursuant to *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires that every element of the offense of conviction be proven beyond a reasonable doubt).

On April 12, 2011, petitioner filed this petition for writ of habeas corpus; it raised only the "*Jackson* claim" regarding the allegedly lacking element of the robbery charge.  Docket No. 1.  On June 23, 2011, petitioner inquired whether the San Francisco Police Department had materials in its files relating to former San Francisco Police Department Inspector Daniel Gardner, the lead investigator and a prosecution witness in petitioner's case.  Docket No. 32, Ex. C.  On August 18, 2011, the San Francisco County District Attorney responded to petitioner's inquiry and stated that the San Francisco Police Department advised them that material in Gardner's personnel file may be subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963).  *Id.*, Ex. D.  The District Attorney filed a motion for discovery in the Superior Court for Gardner's personnel records on September 21, 2011.  Docket No. 35, Ex. 1.  The motion requested the court to conduct an *in camera* review of Gardner's personnel file to disclose to the District Attorney and petitioner any *Brady* material located within the file, and to issue a protective order for the file, which the Superior Court subsequently executed.  *Id.*   Petitioner then filed a motion in this Court to hold in abeyance his habeas claim pending exhaustion of his state court remedies on his *Brady* claim. Docket No. 14.

On March 7, 2012, petitioner filed a petition for writ of habeas corpus in the Superior

1    Court for the County of San Francisco, requesting the court order the District Attorney's office to

2    produce all additional *Brady* material relating to Gardner, order an evidentiary hearing to

3    determine the full scope of the Gardner *Brady* material, and vacate the judgment of his conviction.

4    Docket No. 32, Ex. E.  In its order, the Superior Court considered and discussed the Gardner

5    *Brady* evidence but ultimately denied petitioner's writ.  Second Amended Petition, Docket No. 25,

6    Ex. 33.  Petitioner's subsequent petition for writ of habeas corpus and petition for review were

7    denied by the First Appellate District Court of Appeal and the California Supreme Court,

8    respectively.  Docket No. 32, Exs. F, G, H, I.

9         Petitioner then returned to this Court and filed motions to lift the stay and re-open the case,

10   and for leave to file an amended petition.  Docket No. 19.  The second amended petition was filed,

11   containing both petitioner's *Jackson* and *Brady* claims.  Docket No. 25.  The government

12   answered the second amended petition.  Docket No. 31.  Petitioner then filed a motion for

13   discovery of documents, which the Court denied, finding that petitioner could not show good

14   cause for his request and that the discovery sought was largely duplicative of the request he made

15   in state court.  Docket No. 37.  Petitioner subsequently filed a traverse.  Docket No. 41.

16

17                              **JURISDICTION AND VENUE**

18        This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C.

19   § 2254.  28 U.S.C. § 1331.  Venue is proper because the challenged conviction occurred in San

20   Francisco County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

21

22                                   **EXHAUSTION**

23        Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

24   either the fact or length of their confinement must exhaust their state court remedies by presenting

25   the highest state court available with a fair opportunity to rule on the merits of each and every

26   claim they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute

27   that petitioner has exhausted his state court remedies for the claims asserted in the petition.

28

**STANDARD OF REVIEW**

A federal court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"The 'contrary to' and 'unreasonable application of' clauses in § 2254(d)(1) are distinct and have separate meanings." *Moses v. Payne*, 555 F.3d 742, 751 (9th Cir. 2009) (citations omitted); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002) ("§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.").  "A state-court decision is contrary to . . . clearly established [federal law] if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Early v. Packer*, 537 U.S. 3, 8 (2002)).  However, the state court need not cite the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal

United States District Court
Northern District of California

habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

Petitioner presents the Court with two arguments: the first as to his *Brady* claim, and the second as to his *Jackson* claim.

## I.    *Brady* Claim

Petitioner's *Brady* claim is premised upon the failure to produce evidence involving Inspector Gardner, a key inspector in the robbery case.  Docket No. 25-3, Ex. 33.  Petitioner filed a petition for writ of habeas corpus in the Superior Court for the County of San Francisco.  *Id.*  The Superior Court analyzed petitioner's claim, found that the Gardner evidence was not material, and therefore no *Brady* violation occurred.  *Id.*  The state court petition for writ of habeas corpus was denied.

### A.  The Gardner Evidence

The facts relevant to petitioner's *Brady* claim are as follows:

The key inspectors on the case were Daniel Gardner and Daniel Leydon.  Leydon eventually was promoted to lieutenant in the sex crimes detail, but Gardner remained on the case full-time.

CSI inspector Suyehiro collected all the items at the scene that he thought might have latent prints on them. He did not collect the poster board or newspaper that eventually revealed latent prints; rather, Inspector Gardner found the poster board on the day of the robbery and gave it to Suyehiro when they were in the robbery detail office.

Gardner went back to the scene on the 8th and 9th.  On the 9th he found a newspaper (the San Francisco Chronicle) and pointed it out to Inspector Gregory of the Crime II Scene Investigation Unit, who photographed and seized it. Gregory checked the newspaper for fingerprints and the prints that were found matched Petitioner and George Turner. (RT 1115:3-21.) Turner was arrested in

June, wearing an antique watch from the Lang robbery. (RT 1316:22-1317:13.) He had more of the stolen jewelry in a bag in his hotel room, with a value of $650,000.   Turner eventually entered a guilty plea to the charges against him. Dino Smith was found guilty after jury trial.

Inspector Leydon' s notes from the 9th list an address that was later confirmed as Petitioner's.   A second address is also written in those same notes. In a chronological report for April 9th, it is indicated that the officers went to Oakland on that day to speak with Erin Beeghly.

At the beginning of the trial the prosecutor introduced Inspector Daniel Gardner as the investigating officer and explained that Gardner would be "sitting in during the trial."  Gardner testified to his extensive experience, telling the jury he had been an officer for 29 years, an inspector for 16 years, and had been in the robbery detail for 8 years.

One store employee, Richard Frey, was asked to look at a photo line-up. He showed interest in both Dino and Troy Smith, but only positively identified Dino Smith as one of the robbers. According to Gardner, none of the victims of the robbery positively identified petitioner.

During the robbery the third robber remained behind the wall with the hole in it. Two victims saw the figure through the hole, but could not identify the figure.

As stated previously, Inspector Gardner retrieved a piece of poster board at the scene and gave it to CSI Suyehiro.  There were fingerprints on that poster board, belonging to George Turner, Inspector Gardner, and Troy Smith.

Two days after the robbery the inspector went back to the scene and went in a room he had not entered before.  There he saw two newspapers, which were photographed and taken by CSI Gregory.  There were fingerprints on one of the newspapers belonging to George Turner, and one belonging to Troy Smith.  The newspaper was an edition that was printed between 2:00 AM and 2:45 AM in the San Francisco city plant.  The batch was distributed mainly to news racks in the city….

♠   *   *   *

Sometime after trial petitioner was made aware of some potential "Brady" information about Inspector Gardner. That evidence related to an incident in which Gardner was found to have lied to other officers during an internal investigation.

In 1997 several officers asked Inspector Gardner to help them prepare for an Assistant Inspector exam. He met with an officer the day before the exam. That officer revealed to Gardner that he had the answers to the exam, and knew what scenarios would be presented on the exam. Gardner provided this information to the unit administering the test. The test was canceled, and an investigation into the matter was started.

There was conflicting evidence as to some of the details of Gardner's conduct, but Gardner admitted he lied during the investigation to protect himself.

*In re Smith,* Superior Court of California County of San Francisco, January 14, 2013 ("The Superior Court Order"), at 2-3, 6.

**B.  *Brady* Standards**

"Supreme Court holdings at the time of the state court's last reasoned decision are the source of clearly established Federal Law for the purposes of AEDPA."  *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003)).  Here, when the Superior Court issued its decision denying petitioner's habeas petition, the elements of a *Brady* claim were clearly established under Supreme Court law.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  In order to establish a *Brady* claim a defendant must show: (1) the prosecution suppressed evidence; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was material.  *Id.*

"Evidence is favorable if it is exculpatory or impeaches a prosecution witness, and suppression occurs when favorable evidence known to police or the prosecution is not disclosed, either willfully or inadvertently."  *United States v. Lopez*, 577 F.3d 1053, 1059 (9th Cir. 2009).  "Even if evidence favorable to the defendant has been suppressed or not disclosed by the prosecution, there is no true *Brady* violation unless that information is material."  *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013) (citing *Strickler*, 527 U.S. at 289-90).  "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010).  "A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial."  *Id*.  "Reversal of a conviction or sentence is required only upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Olsen*, 704 F.3d at 1183 (quoting *Williams v. Ryan*, 623 F.3d 1258, 1274 (9th Cir. 2010).

**C.  Review of the Superior Court's Decision**

The Superior Court found that no *Brady* violation occurred because the new evidence was not material.  Under AEDPA, the Court must defer to that finding unless the decision of the Superior Court is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision

1    that was based on an unreasonable determination of the facts in light of the evidence presented in

2    the State court proceeding." 28 U.S.C. § 2254(d).

3          Petitioner asserts that the Superior Court's decision was "contrary to" Supreme Court

4    precedent, arguing the court undertook the wrong materiality analysis under *Brady* by failing to

5    consider the cumulative impact that the Gardner evidence would have had on the trial as a whole.

6    SAP 51.   Additionally, petitioner argues that the Superior Court's decision was based on an

7    unreasonable determination of the facts. *Id.*

8

9               **1.  Contrary To Clearly Established Federal Law**

10         The Supreme Court has held that suppressed evidence is material "if there is a reasonable

11   probability that, had the evidence been disclosed to the defense, the result of the proceeding would

12   have been different."   *United States v. Bagley*, 473 U.S. 667, 682 (1985).   In determining

13   materiality the court must analyze the withheld evidence "in the context of the entire record."

14   *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97,

15   112 (1976)).   Specifically, when analyzing withheld evidence for materiality, the Supreme Court

16   has held that courts should engage in a two-step analysis. *Kyles v. Whitley*, 514 U.S. 419, 436,

17   n.10 (1995).   First, courts should evaluate "the tendency and force of the undisclosed evidence

18   item by item." *Id.*   Second, courts should evaluate the "cumulative effect [of the withheld

19   evidence] separately and at the end of the discussion [.]". *Id.*   The Ninth Circuit has held that a

20   failure to complete both parts of the materiality "equation" will result in a decision that is

21   "contrary to clearly established Federal law." *See Barker v. Fleming*, 423 F.3d 1085, 1094 (9th

22   Cir. 2005).

23         The Superior Court did not render a decision "contrary to clearly established Federal law"

24   by failing to complete the two-step materiality analysis.  In its order, the Superior Court identified

25   the correct legal standard under *Brady* and *Strickler* and discussed the relevant Supreme Court

26   precedent. Superior Court Order at 6-9. The Superior Court completed step-one of the materiality

27   analysis when it evaluated the withheld evidence and determined that its tendency and force was

28   such that it could only "be used to attack [Inspector Gardner's] credibility in a general sense

United States District Court
Northern District of California

[because] it is not related to the Petitioner's case." Superior Court Order at 11. Further, the Superior Court's order shows that the court completed step-two by considering what effect a successful attack on Inspector Gardner's general credibility would have had on this case, in light of the other evidence presented against petitioner at trial. For example, the court explained the following:

> The petitioner argues that here the main evidence against him was the fingerprint on the newspaper. Since the newspaper could be dated to the time of the robbery it was arguably more important than the fingerprint on the poster board. Since no one could identify the third robber as petitioner, he claims the fingerprint evidence was the only real evidence against him. He implies that Inspector Gardner planted this evidence and if Gardner could have been impeached with the new evidence of his misconduct, the outcome of the trial would have been different.

> Evidence against the petitioner included fingerprints on both the poster board and the newspaper that were found at the scene. Along with petitioner's fingerprints, each item had George Turner's fingerprint on it. The fact that petitioner's fingerprint and the fingerprint of a convicted participant in the crime were on the same items strengthens the fingerprint evidence. Still photos taken from a video recording from nearby Saks Fifth Avenue shows people entering the abandoned restaurant shortly before the robbery, and the prosecutor pointed out that one person appeared to be carrying a newspaper.

> Petitioner abandoned his apartment after the robbery. He never paid rent again once the robbery occurred. The apartment was cleaned out when officers arrived, except for a few items, one of which was a dog food bowl on the floor. The officers confronted a man in the apartment garage, who had cleaning supplies, clothing, correspondence (later tied to petitioner), a puppy and earrings from the robbery in his car. The man said Debbie Warner gave him the earrings.

> Debbie Warner was the girlfriend of petitioner's brother. In a subsequent search of her apartment the police found the same box of correspondence (from the car in the apartment garage) containing letters and bills addressed to petitioner. They also found petitioner's wallet at Debbie Warner's, and a witness placed petitioner at the building where Warner lived in the days after the robbery. Sammy, a man who sold some of the jewelry, said he gave the money for the jewelry to Debbie Warner. . . .

> ♦   *   *   *

> The evidence presented against Petitioner at trial is stronger than Petitioner characterizes in his petition. While the new *Brady* evidence involving Inspector Gardner could be used to attack his credibility in a general sense, it is not related to the Petitioner's case . . . . After reviewing the evidence presented against Petitioner, and the *Brady* evidence discovered after trial, this court finds the new evidence is not material, and so no *Brady* violation occurred.

Superior Court Order at 10-11.

The Superior Court evaluated the inculpatory evidence presented at trial and concluded

that the withheld evidence was not "material" because:  (1) the withheld evidence was not directly related to petitioner's case, and (2) the prosecution presented additional inculpatory evidence that was not dependent on Inspector Gardner's credibility.  *Id.*  In other words, the Superior Court determined that the "tendency and force" of the withheld evidence went to attacking Inspector Gardner's credibility in a general sense and then considered what effect such an attack would have had on the trial in light of the entirety of the evidence presented at trial.  This is what is required under *Kyles* and *Barker*.  *See Kyles*, 514 U.S. at 474; *Barker*, 423 F.3d 1085.  Accordingly, because the Superior Court completed both steps of the Supreme Court's materiality analysis, it did not apply the wrong materiality rule as petitioner suggests.

Next, petitioner argues that the Superior Court engaged in an improper "sufficiency of the evidence analysis" and therefore its decision is "contrary to clearly established federal law." SAP at 62.  In support of his argument, petitioner notes that "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusion."  SAP at 63 (citing *Strickler*, 527 U.S. at 290).  Petitioner then argues that the Superior Court's statement that "[t]he evidence presented against Petitioner at trial is stronger than Petitioner characterizes in his petition" establishes that the Superior Court engaged in this kind of improper materiality analysis.  SAP at 63; Superior Court Order at 10-11.

The Superior Court did not engage in the type of forbidden materiality analysis petitioner alleges.  Instead, the Superior Court's Order shows that it reasonably determined that the withheld evidence could have been used to attack Inspector Gardner's credibility in a general sense, but was not related to petitioner's case and therefore would not have had a meaningful "discounting" effect on the inculpatory evidence presented at trial.  Superior Court Order at 11.  The Superior Court reasoned that the undisclosed evidence could not have changed the outcome of petitioner's case because it would not have created a reasonably probability that a jury would have believed the defense theory that Gardner planted the fingerprint evidence and it did not cast doubt on any of the inculpatory evidence in this case.  This conclusion was not objectively unreasonable.  Moreover, whether the Superior Court was correct in determining that the withheld evidence was unrelated to

petitioner's case is not the proper inquiry under AEDPA's "contrary to" prong. *See*, *e.g.*, *Brown*, 544 U.S. at 141. Accordingly, the Court finds that the Superior Court did not engage in an improper "sufficiency of the evidence analysis" and did not apply the wrong materiality rule.

### 2. Unreasonable Determination of the Facts

Petitioner also contends that the Superior Court's *Brady*-materiality decision was based on an unreasonable determination of the facts. SAP at 66. Specifically, petitioner contends that the Superior Court unreasonably determined that: (1) petitioner over-emphasized the importance of the newspaper; (2) the video tape showed someone entering the abandoned restaurant holding a newspaper; (3) the poster board fingerprint evidence would not have been undermined by the withheld evidence; (4) George Turner's fingerprint strengthened the poster-board fingerprint evidence; (5) petitioner's failure to self-surrender was inculpatory evidence; and (6) the withheld evidence was unrelated to petitioner's case. Id.

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor*, 366 F.3d at 999. Here, the record shows that the Superior Court's factual determinations were not unreasonable.

First, the Superior Court did not make any unreasonable determinations with respect to the newspaper fingerprint evidence or the poster board fingerprint evidence. Instead, the court reasonably recognized that the withheld evidence would not have directly affected any of the inculpatory evidence in this case—which includes the fingerprints on the newspaper and poster board—because the withheld evidence does not show that Inspector Gardner did anything inappropriate in this case. Superior Court Order at 10-11. The Superior Court did not make an objectively unreasonable determination by concluding that Inspector Gardner's improper behavior in a completely unrelated case could not cast enough doubt on the newspaper and poster board fingerprint evidence to place this case in a different light.

Second, the Superior Court did not make an unreasonable determination with respect to the videotape evidence. Instead, the Superior Court simply noted that the "prosecutor pointed out that

1    [in the video] one person appeared to be carrying a newspaper." Superior Court Order at 10.

2    Contrary to petitioner's suggestion, the Superior Court's statement appears to be nothing more

3    than recognition that the jury could have accepted the prosecution's characterization of the

4    videotape. This is not an objectively unreasonable statement.

5         Third, the Superior Court's recognition that George Turner's fingerprints on the newspaper

6    and the poster board strengthened the inculpatory value of that evidence was not objectively

7    unreasonable. AEDPA's § 2254(d)'s "highly deferential standard for evaluating state-court rulings

8    . . . demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*,

9    537 U.S. 19, 24 (2002) (internal citation and quotation marks omitted). The record shows that the

10   jury was made aware that George Turner was found in possession of $650,000 worth of jewelry

11   from the jewelry heist. 3RT 669-70; 4RT 1311-15; 1316-19; 6RT 1550-52,1568. Thus, that

12   Turner's conviction was the result of his *Alford* plea and that the Superior Court therefore may

13   have technically erred in referencing the plea and conviction does not make its general position

14   regarding Turner's fingerprints unreasonable when considered in light of the entire record. This

15   Court must give the Superior Court the benefit of the doubt and recognize that the record supports

16   the Superior Court's general position that the presence of Turner's fingerprints "strengthens the

17   fingerprint evidence." Superior Court Order at 10. Accordingly, the Superior Court's

18   determination regarding the Turner's fingerprints was not objectively unreasonable.

19        Fourth, the Superior Court's reference to petitioner being "'on the run' for almost three

20   years," does not establish that the court made an unreasonable factual determination. Petitioner

21   does not dispute that he fled the authorities for almost three years. SAP at 69-70. The Superior

22   Court's reference to this fact appears to be nothing more than an acknowledgement that the jury

23   was made aware of petitioner's flight. Because the Superior Court reasonably determined that the

24   withheld evidence would not have affected the fact of petitioner's flight, the Superior Court was

25   not unreasonable in its determination that petitioner's flight may have been an inculpatory fact in

26   the jury's eyes.

27        Lastly, the Superior Court's determination that the withheld evidence was "unrelated" to

28   petitioner's case was not unreasonable. The withheld evidence in this case showed that Inspector

United States District Court
Northern District of California

16

Gardner lied in connection with a prior police investigation independent from petitioner's case. Accordingly, the Superior Court was not objectively unreasonable in characterizing the withheld evidence as "unrelated" to petitioner's case.

For the foregoing reasons, the Court cannot say that the Superior Court's denial of petitioner's *Brady* claim was "contrary to" or "an unreasonable application of" Supreme Court law.

## II.   *Jackson* Claim

Petitioner also argues that the California Court of Appeal's decision violated his right to due process guaranteed by the Fourteenth Amendment.  Specifically, petitioner contends that because the prosecution's theory of the case was that the jewelry store owner consented to the taking of the jewelry, the "intent to permanently deprive the owner of his property" element of robbery could not have been satisfied.  SAP at 76.  Petitioner asserts that the California Court of Appeal's conclusion that all of the elements of robbery were met was objectively unreasonable because "[n]o rational trier of fact could conclude that a person who participated in a scheme—with the owner's consent—that provides the owner with $4.475 million acted with the intent to deprive the owner of his property." *Id.* at 76-77.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th

United States District Court
Northern District of California

1    Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court "determines only whether, 'after

2    viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

3    have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at

4    338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of

5    guilt beyond a reasonable doubt, has there been a due process violation.  *Jackson*, 443 U.S. at 324;

6    *Payne*, 982 F.2d at 338.

7              After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional

8    layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal

9    habeas court must ask whether the operative state court decision reflected an unreasonable

10   application of *Jackson* to the facts of the case.  *Coleman*, 132 S. Ct. at 2062; *Juan H.*, 408 F.3d at

11   1275 (quoting 28 U.S.C. § 2254(d)).  Thus, if the state court affirms a conviction under *Jackson*,

12   the federal court must apply § 2254(d)(1) and decide whether the state court's application of

13   *Jackson* was objectively unreasonable.  *See McDaniel v. Brown*, 558 U.S. 120, 132 (2010).  To

14   grant relief, therefore, a federal habeas court must conclude that "the state court's determination

15   that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each

16   required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v.*

17   *Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).  In sum, sufficiency claims on federal habeas

18   review are subject to a "twice-deferential standard."  *Parker v. Matthews*, 132 S. Ct. at 2152

19   (2012) (per curiam).  First, relief must be denied if, viewing the evidence in the light most

20   favorable to the prosecution, there was evidence on which "any rational trier of fact could have

21   found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443

22   U.S. at 324).  Second, a state court decision denying a sufficiency challenge may not be

23   overturned on federal habeas unless the decision was "objectively unreasonable." *Id.* (quoting

24   *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)).

25            Here, petitioner argues that the key element of robbery—intent to deprive the owner

26   permanently of his property— was not met because the heist was an inside job undertaken at the

27   store owner's behest.  SAP at 76.  According to petitioner, the Court of Appeal failed to assess

28   "the intent to deprive the owner" element, thereby making its conclusion objectively unreasonable.

United States District Court
Northern District of California

*Id.* at 79.

A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *See Dixon v. Williams*, 750 F.3d 1027, 1033 (9th Cir. 2014) (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). A habeas petitioner may not transform a state law issue into a federal one merely by asserting a due process violation. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). The state's highest court is the final authority on the law of that state. *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979). However, even a determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Hicks v. Feiock*, 485 U.S. 624, 630 n.3 (1988) (citation omitted).

In rejecting petitioner's claim, the California Court of Appeal thoroughly analyzed and construed California law and held that the intent to permanently deprive "innocent employees" of property that has been placed in their control is sufficient to satisfy the "intent to deprive" element of robbery. *See People v. Smith*, 177 Cal. App. 4th 1478, 1491-92 (2009). Specifically, the Court of Appeal held, in pertinent part, as follows:

> As noted, appellant's argument is, essentially, that the property owner's consent in the "inside job" scenario negates one of the elements of robbery by rendering the taking non-felonious. For guidance on this issue, we look to the California Supreme Court's examination of the meaning of the term "felonious taking." "[B]y use of the ... term 'felonious taking' in section 211, the Legislature was ... incorporating into the ... statute the affirmative requirement, derived from the common law rule applicable to larceny and robbery, that the thief or robber has to intend to take property *belonging to someone other than himself* in order to be guilty of theft or robbery, that is to say, the common law recognition of the defense of claim of right." (*Tufunga, supra,* 21 Cal.4th at p. 946, 90 Cal.Rptr.2d 143, 987 P.2d 168, italics added.) *Tufunga* held, on the basis of this reasoning, that a good faith claim of right to the ownership of specific property can negate the element of felonious taking that is necessary to establish theft or robbery.
>
> This holding does not, however, necessarily imply that the taking involved in an "inside job" robbery is *not* felonious, and may in fact, imply the opposite because it requires only that the property belong to someone other than the taker. The common law understanding of the "felonious taking" element of larceny and robbery, on which *Tufunga* relied, also includes the concept that "[a] person may be a victim of larceny even though he is not the owner [of the property taken]; he need only have a special property right, as in the case of a bailee or pledgee. It is enough that he has possession and that it is lawful as to the defendant, or that because of a legally recognized interest in the property he is entitled to possession

as against the defendant. Moreover, the person from whom the property is taken qualifies as a victim of larceny even though he does not have the right of possession as against the true owner." (Wharton's Criminal Law, (15th ed.1995) § 381, pp. 454–456, fns. omitted.) . . . .

In short, " '[c]onsidered as an element of larceny, "ownership" and "possession" may be regarded as synonymous terms; for one who has the right of possession as against the thief is, so far as the latter is concerned, the owner.' [Citation.] It is, after all, a matter of no concern to a thief that legal title to the stolen property is not in the complainant. [Citation.] ... 'Possession alone, as against the wrongdoer, is a sufficient interest to justify an allegation and proof of ownership in a prosecution for larceny.' " (*People v. Price* (1941) 46 Cal.App.2d 59, 61–62, 115 P.2d 225) . . . .

[W]hen the owner of a store consents to an "inside job" robbery that occurs while the store is under the control of employees who are unaware of the owner's plan, the owner's consent does not vitiate the "felonious taking" element of robbery.  If the property that is taken was in the possession of the owner's innocent employees or agents, that is sufficient to make the taking felonious, even if the owner himself or herself is secretly in league with the perpetrators.

*Id.*

This Court is bound by the Court of Appeal's interpretation of California law.  *Hicks*, 485 U.S. at 630 n.3.  To the extent that petitioner challenges the legal sufficiency of the Court of Appeal's conclusion, this claim is not cognizable.  Furthermore, the Court of Appeal's conclusion was a reasonable determination of the facts in light of the evidence presented.  Viewing the evidence in the light most favorable to the prosecution, this Court finds that a rational trier of fact "could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319; *see also Payne*, 982 F.2d 335 at 338.  As such, this Court finds that petitioner has not established a *Jackson* violation.

## CONCLUSION

For the foregoing reasons and for good cause shown, and on the basis of the record before it, the Court hereby DENIES the petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

Dated:  July 17, 2015

SUSAN ILLSTON
United States District Judge